# CASES ADJUDGED IN UNITED STATES COURT OF CUSTOMS APPEALS.

AMERICAN CHICLE Co. v. UNITED STATES (No. 1905).[1]

CHICLE DESICCATED.

Chicle, the sap having been drawn from the tree and coagulated by artificial heat into hard chunks in Mexico, shipped to Canada, and there ground and dried, the grinding and drying bearing no relation to transportation and being a process in the manufacture of chewing gum, known commercially as desiccated chicle, is dutiable under paragraph 36, tariff act of 1913, as chicle "advanced in value by drying, straining, or any other process or treatment whatever beyond that essential to the proper packing," and not as "chicle, crude."—Sheldon & Co. v. United States (8 Ct. Cust. Appls., 9; T. D. 37123) followed and Perry, Ryer & Co. v. United States (2 Ct. Cust. Appls., 374; T. D. 32096) distinguished.

United States of Customs Appeals, November 26, 1918.

APPEAL from Board of United States General Appraisers, Abstract 41818.

[Affirmed.]

*Crim & Wemple (John W. H. Crim, William L. Wemple, and George C. Winne* of counsel) for appellants.

*Bert Hanson,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

[Oral argument Nov. 8, 1918, by Mr. Wemple and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The merchandise in this case consists of chicle, which was assessed for duty under the provisions of paragraph 36 of the tariff act of 1913, which provides for chicle "refined or advanced in value by drying, straining, or any other process or treatment whatever beyond that essential to the proper packing." The protestants claim that it should have been assessed at 15 cents per pound under the same paragraph 36 imposing a smaller duty upon "chicle, crude." The Board of General Appraisers sustained the assessment as made and the importers appeal.

A commodity at least very similar to this, if not identical with it, was considered by this court in Sheldon & Co. v. United States (8 Ct. Cust. Appls., 9; T. D. 37123).

---

[1] T. D. 37841 (35 Treas. Dec., 243).

The record in this case shows that crude chicle is obtained from the sap of the sapodilla tree, being drawn therefrom in a liquid form of about the consistency of cream, and then coagulated by artificial heat into hard chunks. These chunks are placed in jute bags and shipped in vessels from Mexico to a northern seaport and thence by rail to Toronto, Canada. At this point the importers in this case maintain a plant at which they treat the imported product by breaking up the lumps and reducing it to a granulated form and subjecting it to the process of drying, in which condition it is repacked and shipped to various gum factories in the United States. The importers' witness testifies as to this plant as follows:

Q. Is that plant engaged practically exclusively in the development of crude chicle?—A. No, sir, it is not. We have a factory there for the manufacture of chewing gum for sale in Canada.

Q. But I mean that part of the factory which you use for treatment of this chicle as it comes from Mexico is especially designed as a desiccating plant for the treatment of the product, isn't it?—A. Yes, for the purpose of breaking it up and fixing it; putting it in such shape so that it can be shipped to our various factories in the United States.

Q. (By General Appraiser McClelland.) Have you any such plant in the United States?—A. No, sir.

Q. That is the reason that you ship this cruder form of chicle to Canada?— A. Yes, sir, for the sake of convenience we have the property there, the factory there, the buildings; we have not any such place in the United States where we could do it.

  *          *          *          *          *          *          *

Q. (By General Appraiser McClelland.) Are there any political reasons or other reasons why you could not establish it in the United States?—A. There are reasons of convenience. We have a plant and factory in Canada which costs us hundreds of thousands of dollars.

Q. The fact is, you haven't it over in this country or in Mexico; you have it for your own reasons in Canada. It does not make any difference why you have it there; you have it?—A. I am explaining; we would be quite willing to bring such a plant into the United States provided we could do this work in bond.

It further appeared that this crude chicle was imported into the United States to some extent, and the witness was asked:

Q. The chicle imported into the United States in the extremely crude condition, is that used in that condition in this country?—A. No, sir; that also has to be dried out in the sense that the moisture must be taken out before we can use it for chewing gum.

Q. Is that sent in bond to Canada to be treated the same as this shipment?— A. Why, for the sake of convenience we very often have to import goods here. For instance, it might be used in connection with making loans on collateral, etc. If you had it up in Canada you could not very well make these loans on goods up—out of the country. But very recently, during the past year, we have shipped about half to three-quarters of a million pounds through bond here in New York to Canada for the purpose of this treatment that you have been speaking about.

It also appears that this crude chicle has been shipped in burlap bagging from Mexico to Toronto for 17 years, and, further, it

appears that some of the bags on the journey from Mexico become broken, and the estimate is made that the percentage of loss is something like 6 or 7 per cent, yet this practice of using these bags and shipping in this manner has continued for all this period of years. The loss seems not to have been so considerable as to prevent a continuance of the traffic or to lead to the adoption of other means of fitting the chicle for shipment from that country to Toronto, a distance of 2,000 miles. Whether the importers acted wisely or unwisely in shipping chicle in its crude state in bags that long distance is relatively unimportant. The shipment of the merchandise here in question to Toronto was an accomplished fact before the process of desiccation was applied to it.

The real question here, therefore, is whether the chicle in its condition as it arrives in Toronto is sufficiently dry to be in that respect fitted for proper packing. Apart from the fact that the chicle has been shipped this great distance without any more serious loss than that shown by this record, it must be evident that it has in the nature of things lost much of its moisture and is by so much in better condition to be packed than when started on its first journey. We are not convinced that it might not then, on its arrival in Toronto at the end of its 2,000-mile journey, have been repacked and shipped to its destination with entire safety.

To repeat, the importation to Canada from Mexico is not involved here. The question is whether the merchandise which the importers seek to introduce into this country was before its last advance or treatment in condition fit for packing. We think it was.

It is furthermore manifest from the record that the process of desiccating this chicle at Toronto was one of the processes fitting the material for its final use in the manufacture of chewing gum, and that the plant is maintained in Toronto for the importers' convenience. This view is greatly strengthened by the testimony quoted showing that the importers import this material into this country and then export it to Toronto to be returned prepared for its ultimate use. It may well be asked why, if it is not necessary to desiccate the crude chicle before it can be safely shipped from the United States to Toronto for treatment it should be deemed essential to desiccate it after its arrival in Toronto before reshipment to the United States.

In the case of Sheldon & Co. v. United States, supra, it was said:

Unless the court believes that merchants ship their goods several thousand miles in order to prepare them for a shipment of several hundreds of miles—a mere fraction of the first distance and, as here, probably back over the original route—we must conclude this processing at the desiccation works of the importers in Canada, whence this merchandise was imported into this country, was for a purpose other than and "beyond that essential to the proper packing."

The record in this case does not differ so essentially from that in Sheldon & Co. v. United States as to justify a different result.

The case of Perry, Ryer & Co. v. United States (2 Ct. Cust. Appls., 374; T. D. 32096), cited by importers' counsel, is clearly distinguishable from the case here under consideration. The language quoted from the opinion of the court in that case states the view which the court entertained of the facts. It was said:

From the testimony and the exhibits it appears quite clear that it is not practicable to ship the fustic wood in question in its natural shape and condition. If it were shipped in bulk in that condition, the freight rates would be unreasonable; if it were packed in its natural condition in sacks, its jagged projections would tear open the sacks and the contents would be scattered and lost. Therefore it is clear that the wood must be reduced in size to some extent in order to pack it for transportation.

A distinction between the two cases is that there was no desiccation in the case cited, nor had the importation there considered been preceded by like importations in the crude form on shipments of 2,000 miles or more for a period of 17 years, as appears to have been the fact in this case. If such facts had appeared in that case, it can not be assumed that the court would have characterized the attempt to import under those conditions as impracticable.

We can not escape the conclusion that this importation was made to Canada and the treatment there given in the course of the importers' business with a purpose of fitting the product for its ultimate use in the manufacture of gum, and that this establishment is maintained in Canada rather than in the United States for the convenience of the importers, and under these circumstances it is no hardship to require the payment of duty.

The decision of the Board of General Appraisers is *affirmed*.